**The below described is SIGNED.**



**Dated: November 13, 2007**

*William J. Thurman*

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number:  05-34474 |
| **Steve Zimmer Paige,** | Chapter 11 |
| Debtor. | |

## MEMORANDUM DECISION

The matter before the Court is the consideration of Confirmation of competing Chapter 11 liquidating plans – the Joint Chapter 11 Plan filed by Gary Jubber (the "Trustee") and ConsumerInfo.com, Inc. ("ConsumerInfo"), and the Second Amended Plan filed by Search Market Direct, Inc. and Magnet Media, Inc. (collectively referred to as "SMDI").  The Court has held seven days of evidentiary hearings and argument on this matter, which concluded on October 15, 2007.  From the evidence presented and arguments made, as well as the Court's observation of its own docket entries, the Court makes the following findings of fact and conclusions of law.

I.        **BACKGROUND**

As a preliminary matter, the Court notes that considerable time and money has been devoted by the parties in this matter.  The Court has heard considerable evidence and has reviewed applicable law in depth.  Both sides have presented significant and persuasive arguments.  Although it has been a challenge to sort through all the evidence and arguments presented by the parties, the Court believes it has done so appropriately and elects to issue this written decision.  Both sides are to be commended for their research, preparation, and presentation.  They have been excellent.

In order for the parties to understand the Court's ruling, the Court has elected to provide a summary of the history of this case, which should be considered as part of the Court's findings of fact and conclusions of law.

The Debtor, Steve Zimmer Paige, commenced this case *pro se* under Chapter 7 of the Bankruptcy Code on September 16, 2005.  Gary Jubber was appointed as the Chapter 7 Trustee.  Prior to that date, the Debtor, and possibly others, were involved in the creation of a internet Domain Name, "FreeCreditScore.com" (the "Domain Name").  When the Debtor filed his case, he did not list the Domain Name as an asset nor did he list it as something transferred.   In addition, his statement of financial assets and schedules were deficient in failing to properly list all the creditors and the amounts owed.

Subsequent to the filing of the case, Search Market Direct (hereinafter "SMDI") asserts that it purchased the Domain Name.  It is important to clarify at this juncture that although the Court has preliminarily ruled that the Debtor was the owner of the Domain Name as of the petition date for the purposes of estimation of claims and in connection with the motion to compel testimony of ConsumerInfo's counsel, those findings are not conclusive for the pending

2

adversary proceeding (hereinafter the "AP").  Under the Joint Plan, the AP continues, but under

the SMDI plan, that issue is resolved by settlement and dismissal.  Thus, the Court elects not to

prejudge that issue at this time.  Further, any prior findings in connection with this plan

confirmation process as to ownership of the Domain Name as of the date of petition were and are

preliminary, and based solely on the evidence presented for the estimation hearing , the motion

to compel hearing, and these confirmations hearings.

With that overview, the evidence demonstrates that an assignee of the Debtor, without

the knowledge of the Trustee, transferred the Domain Name to SMDI.  SMDI paid $350,000 for

the Domain Name in early 2006.  SMDI was not aware of the Debtor's bankruptcy case at the

time it acquired the Domain Name.  Mr. Steven May is the principal and owner of SMDI, and he

has appeared and testified in this case numerous times.  Subsequent to this transfer, through a

then undisclosed informant in a manner of clandestine disclosure and intrigue, the Trustee

became aware of the Debtor's interest in the Domain Name and began an investigation as to the

estate's rights in the same.

The Trustee concluded at that time that the estate had a right to the Domain Name or

could recover it, and initiated an AP against SMDI, Steven May, and others for recovery of the

same and/or declaratory relief that the estate was the owner.  In various causes of action, the

Trustee claims that the transfer to SMDI was void or voidable.  It should be noted that the

Trustee has amended his complaint in the AP to include ConsumerInfo as a joint plaintiff.

Believing that the estate had a claim to the Domain Name, Mr. Jubber, as Chapter 7

Trustee, negotiated with several parties in an attempt to sell the estate's interest in the Domain

Name.  He received several offers from SMDI and from ConsumerInfo.  Initial interest in August

or September of 2006 from these parties indicated that they were willing to pay approximately

$1 million for the Domain Name.  It became apparent, however, that the parties were willing to

pay much more .

      Aside from being a defendant in the AP, SMDI also holds an unsecured claim in this case

having acquired claims from other creditors, and is the assignee of the Debtor's residual

ownership interest.

      The Trustee conducted a very extensive marketing effort in the fall of 2006 in connection

with his intent to sell the Domain Name or an interest in the AP that he had initiated. He

attempted to obtain court approval for an auction in September of 2006, which was postponed to

October.  Prior to the hearing on the auction motion, the Debtor was contacted by counsel for

SMDI who arranged a meeting between counsel for SMDI, the Debtor and Mr. Noel Hyde, a

bankruptcy attorney.  At the meeting at the office of counsel for SMDI, the Debtor and Mr. Hyde

discussed the status of the case. Following that meeting, on October 5, 2006, Mr. Hyde filed a

motion on behalf of the Debtor to convert his Chapter 7 case to one under Chapter 11.  That

motion was granted on October 6, 2006, and accordingly, the Debtor became the debtor-in-

possession.  As of the date of conversion, the U.S. Supreme Court had not yet ruled in the

*Marrama*[1] case, and the Court believed that it was required to permit the conversion under the

case law of this circuit, including *In re Young*[2] and *In re Miller*[3] from the Bankruptcy Appellate

Panel.

---

[1]    *Marrama v. Citizens Bank of Massachusetts*, 127 S.Ct. 1105 (2007).

[2]    *In re Young*, 237 F.3d 1168 (10th Cir. 2001).

[3]    *In re Miller*, 303 B.R. 471 (10th Cir. BAP 2003).

Several days after the hearing on conversion, Mr. Hyde filed a motion to be approved as counsel for the estate, which was approved on October 13, 2006. The day after the Court entered its order converting the case to one under Chapter 11, the former Chapter 7 Trustee moved immediately to reconvert the case back to a Chapter 7. At an expedited hearing on October 13, the Court denied that motion. However, the Court did find cause and ordered the appointment of a Chapter 11 Trustee. Gary Jubber was selected by the US Trustee and was appointed as such. He resumed efforts to sell the Domain Name and/or an interest in the AP that he had commenced to recover the Domain Name. From and after the date of the appointment of the Chapter 11 Trustee, the Debtor was no longer a debtor-in-possession.

Between October 13 and December 7, 2006, the Debtor, without Mr. Hyde's knowledge or involvement, initiated contacts with ConsumerInfo and/or its counsel by telephone conferences, voice mail messages and/or text messages. Shortly after the October 13 hearing, Mr. Hyde advised the Debtor that he would not be paid from the estate after October 13 since a Trustee had been appointed, and Mr. Hyde voiced a concern that he could no longer represent the Debtor without being paid. The Debtor interpreted this to mean that he needed substitute counsel.

During this time period of October 13 to December 7, the Debtor also sought a financial arrangement primarily from ConsumerInfo by way of a consulting agreement. Numerous contacts were made by the Debtor to ConsumerInfo and/or its counsel, Mr. Johnson or Mr. Richards. Mr. Hyde was not included in those discussions. The Debtor advised ConsumerInfo and its attorneys that he was without representation but that he needed it. By this time, he had

already sold his residual interest in the estate to SMDI.[4]  However, Debtor's efforts were

unsuccessful as no agreement was obtained from ConsumerInfo or promised by it.  Debtor's

actions indicate that he was more concerned about securing his personal interests rather than

those of the creditors, and that he was seeking some sort of a compensation package from

ConsumerInfo.

       During this time period, the Debtor was being evasive with SMDI.  In fact, on November

22, 2006, SMDI's counsel sent an email to Mr. Paige indicating its frustration with Mr. Paige's

non-responsiveness from which SMDI's counsel inferred that Mr. Paige had no further interest

in proposing a joint plan of reorganization with SMDI.[5]

       ConsumerInfo agreed to assist the Debtor in obtaining substitute counsel.  ConsumerInfo

was negotiating with the Trustee at that time to make an offer for the Domain Name and was

considering offering the Trustee enough to pay all creditors in full.  ConsumerInfo was

concerned about the accuracy of the statement of financial assets and schedules of the Debtor.

When filed by the Debtor in September of 2005, these documents were inadequate and

inaccurate.  ConsumerInfo was primarily concerned about the amounts that were owed to the

creditors.  It agreed to fund a retainer for Debtor's substitute counsel in the amount of $20,000.

Accordingly, ConsumerInfo wire transferred that amount to Mr. Duane Gillman who was

selected by the Debtor as his new counsel.

       On November 14, 2006, following negotiations with ConsumerInfo and SMDI, the

Trustee filed a motion to sell the estate's interest in the AP to ConsumerInfo for $1.8 million

---

[4]    *See* Ex. 210.

[5]    *See* Ex. EE.

pursuant to an Asset Purchase Agreement (the "APA").  SMDI objected to this Motion.  The

hearing was set for December 7, 2006.

    To add confusion to who was representing the Debtor, if anyone, Mr. Hyde filed an

objection to the sale motion on behalf of the Debtor on or about December 4, 2006, at a time

when the Debtor had previously advised ConsumerInfo that he was without counsel or that he

was going to and wanted to obtain substitute counsel.  The Court notes that a Notice of

Withdrawal of Counsel and Notice of Substitution of Debtor's Attorney was not filed with the

Court until December 8, 2006.  It was signed by Mr. Hyde and Mr. Gillman.  The effect of this

document was to indicate Mr. Hyde's formal withdrawal from the case and to note Mr.

Gillman's entry of appearance.

    There is evidence from the testimony of the Debtor, however, that he engaged Mr.

Gillman before December 8, 2006.  As previously stated, there is also evidence that the Debtor

had interpreted the conversations he had with Mr. Hyde in mid-October, 2006, that Mr. Hyde

would no longer represent him from that point forward.  However, the Debtor's conduct suggests

he was shopping for counsel and still talking to Mr. Hyde.

    On December 7 and 8, 2006, the Court conducted evidentiary hearings on the Sale

Motion.  At the conclusion of the hearing on December 8, the Court issued a Memorandum

Decision approving the sale by the Trustee of a co-interest in the AP to ConsumerInfo for $1.9

million.[6]  An order approving the sale (the "Sale Order") was entered on December 13.[7]

Pursuant to that Sale Order and the approved APA, ConsumerInfo would be entitled to the

_____

    [6]    *See* Mem. Decision Granting Chapter 11 Tr. Mot. to Sell, Dec. 8, 2006
(hereinafter "Mem. Decision").

    [7]    Order Granting Mot. to Sell, Dec. 13, 2006.

ownership of the Domain Name, if the AP was successful, plus 25% of any damages award.[8]
There has been no motion filed to vacate or modify that order, nor has any appeal been filed.

In addition to holding a co-interest in the AP, ConsumerInfo has also acquired an
assignment of various proofs of claims, including proof of claim 1 formerly held by Arrow
Moving & Storage, proof of claim 32 formerly held by Magic Nickel, and proof of claim 27
formerly held by CCB Data Corp. ("CCB"), in the amount of $131,180, which it acquired on
January 22, 2007.

On January 31, 2007, ConsumerInfo filed proof of claim 42, which represented a claim it
had purchased from CCB Data Corp., a company in which the Debtor had previously
participated.  Through proof of claim 42, ConsumerInfo alleged that it had purchased all the
potential interest in the Domain Name previously held by CCB Data Corp.  ConsumerInfo
further alleged that at the time of filing, the Debtor held legal title to the Domain Name as CCB
Data's agent.  Accordingly, ConsumerInfo initially claimed, through claim 42, that the Domain
Name was not the property of the estate because equitable title was held by CCB Data.
Subsequently, ConsumerInfo amended proof of claim 42 on July 3, 2007, to assert only an
unsecured claim for $2.1 million alleging that the Debtor had converted the Domain Name pre-
petition from CCB Data, had breached his fiduciary duties to CCB Data, and had been unjustly
enriched by CCB Data's development of the website.  CCB had also filed proof of claim 27,
which ConsumerInfo has purchased, asserting an unsecured claims against the Debtor but under
a different theory.

---

[8]      *Id.*

8

SMDI has voiced numerous concerns before the Court that proof of claim 42 held by ConsumerInfo is objectionable and should be disallowed.  The Trustee, however, has elected not to object to proof of claim 42.  Accordingly, on April 16, 2007, SMDI filed an objection to claim 42, arguing that the claim was without merit.  ConsumerInfo and the Trustee moved to dismiss this claim objection arguing that SMDI lacked standing to object, and on June 14, 2007, the Court granted that motion.  Specifically, the Court ruled that SMDI lacked standing to object to claims because a Trustee had been appointed and SMDI failed to show that Trustee had refused to prosecute objections to claims unreasonably.

SMDI filed a Motion to Estimate Claims on June 8, 2007, seeking an estimation of claim 42 "for all purposes."  Through its motion, SMDI sought to estimate claim 42 at $0, arguing that the claim was without merit.  ConsumerInfo and the Trustee moved to dismiss the Motion to Estimate, and the Court conducted a hearing on that matter on July 30, 2007.  The Court denied ConsumerInfo's Motion to Dismiss SMDI's Motion to Estimate in part, and held that it would consider the Motion to Estimate but that its estimation would not be "binding for all purposes."  Instead, the Court held that its estimation would only be applicable for confirmation purposes, and specifically, in considering the competing SMDI Plan and the Joint Plan.

On August 8, 2007, SMDI filed a Motion for Leave to Object to Claims, and simultaneously requested that the Court shorten the time for hearing its Motion for Leave.  The Trustee and ConsumerInfo objected to shortening time for hearing of the Motion for Leave, arguing that SMDI failed to show sufficient cause.  The Court denied SMDI's motion to shorten time at a hearing held on August 10, but allowed SMDI to schedule a hearing on its Motion for Leave to Object to Claims, provided it gave appropriate notice of the same.

On August 17, 2007, the Court conducted a hearing on SMDI's Motion to Estimate

Claim 42 (hereinafter the "Estimation Hearing and/or Estimation Ruling").  At that hearing, the

Court ruled that Claim 42 was valid for purposes of confirmation only under the theories of

breach of fiduciary duty owed by the Debtor to CCB Data, and unjust enrichment by the Debtor.

The Court further estimated the amount of claim 42 at $225,000, and by implication, the Court

determined that claim 27, which had been acquired by ConsumerInfo, would be allowed in the

amount of $131,800 since there had been no objection filed to it nor had there been any motion

to estimate it.  Here again, to the extent the Court has made any explicit or implicit ruling as to

the Debtor's ownership of the Domain Name as of the date of petition, it is not binding for

purposes of the AP, since that was not tried here.  The August 17 ruling by its own terms is

incorporated into this decision.

On August 22, 2007, SMDI and Magnet Media filed a Motion to Remove Trustee, and

objections to this motion have been filed by the Trustee and ConsumerInfo.  No party has

requested, nor has the Court scheduled a hearing on that matter at this time.  The arguments

made in that motion, however, were incorporated into SMDI's objection to the Joint Plan.

Competing Chapter 11 plans have been filed.  SMDI and its affiliate, Magnet Media filed

the SMDI Plan in June 2007.  Subsequently, ConsumerInfo and the Trustee filed their Joint Plan.

Both plans' disclosure statements have been approved and they have jointly circulated the same

along with ballots and notices of the confirmation hearing, originally set for August 28, 2007.

An initial evidentiary hearing was held on that date and six subsequent dates.  The parties have

amended their respective plans since their initial filing.

On August 24, 2007, ConsumerInfo and the Trustee filed individual briefs in opposition to SMDI and Magnet Media's Motion for Leave to Object to Claims.  The Court conducted a hearing on that motion on August 27, and ruled that SMDI had failed to carry its burden of showing that the Trustee unreasonably withheld his permission to allow SMDI to object to claims.  Accordingly, the Court denied SMDI's Motion for Leave to Object.

Each of the plans propose to pay unsecured creditors 100% of their allowed claims plus 10% interest.  SMDI's plan proposes to place enough money of its own with the plan trustee to pay all claims in full.  Evidence presented indicated that this would be approximately $2.6 million.  That money is readily available.  Additionally, under SMDI's plan, the plan trustee, SMDI, or any other party in interest with a financial stake in the outcome of an objection to any claim would have standing to object to claims following confirmation.  Further, SMDI's plan would require a dismissal of the AP and conveyance to SMDI of any claim that the estate might have to the Domain Name.  Finally, the SMDI Plan would require the Chapter 11 Trustee to turn over all assets in his possession, including the estate cash in possession of the Chapter 11 Trustee, to the SMDI plan trustee.  There is approximately $1,754,551.94 on deposit with the Chapter 11 Trustee at this time and an additional $101,628 due from ConsumerInfo to fund litigation expenses incurred through September 30, 2007, per the APA.[9]  From all of the funds on hand plus additional funding from SMDI, the plan trustee would pay ConsumerInfo $1,825,000, which is alleged to be the amount required under the APA if the Chapter 11 Trustee settles the AP without ConsumerInfo's consent.  Other allowed claims would also be paid from these funds up to the full amount of the claim plus interest.

---

[9]        *See* Ex. CCC.

The Joint Plan provides for payment of all claims from the funds on hand with the

Trustee which came from ConsumerInfo's purchase price, plus additional amounts due from

ConsumerInfo of $97,000 and $156,000, and an additional amount of up to $300,000 to ensure

that Class 2 creditors[10] receive payment in full with 10% interest on the effective date.  The Joint

Plan provides for the subordination of claims 27 and 42 (or Class 3) to claims in Class 1 (the

priority non-tax claims) and Class 2 (all other unsecured claims, excluding CCB related claims

held by ConsumerInfo).  Under this plan, the AP would continue.  As originally filed, the Joint

Plan provided that the Trustee would be the sole party with standing to object to claims

following confirmation.  However, the Joint Plan has since been amended to allow SMDI to

petition the Court for an authorization to object to claims after the conclusion of the AP,

provided that there are monetary recoveries.  Monetary recoveries as defined in the AP will inure

to the benefit of Class 4 (after Classes 2 and 3 are paid in full), which is the residual interest of

the Debtor now assigned to SMDI.

Under the Joint Plan, should the Trustee eventually be unsuccessful in prosecuting the

AP, ConsumerInfo will not receive title to the Domain Name, notwithstanding its payment of

$1.9 million in connection with the Sale Order or other sums to fund that litigation.  Under

SMDI's plan, the AP would be dismissed and SMDI would be allowed to keep the Domain

Name.

The parties have filed multiple briefs and various documents in support of confirmation

of their respective plans and in opposition to the competing plan.  The Court has carefully

---

[10]     Class 2 is the unsecured class but excludes proof of claims 27 and 42.

12

reviewed the parties' submissions and the evidence presented during this five-day confirmation

hearing process, and makes the following additional findings.

    As previously stated, both plan proponents have had excellent presentations by their

counsel.  Throughout this process, it has been the Court's observation that the proponents' true

intentions throughout this case has been to acquire the right to own and use the Domain Name,

which was developed, and at one point, allegedly owned by the Debtor.  Payment in full to the

creditors is important but secondary to them in that the parties are primarily concerned with

acquiring the Domain Name or the rights to it.  Evidence has been produced that the use of the

Domain Name could be very valuable in the possession of either ConsumerInfo or SMDI,

although it is unclear how much the Domain Name is presently worth since no evidence

regarding profits or revenues from its post-January 2006 use has been disclosed.  SMDI is

presently using the Domain Name and has rejected Trustee's or ConsumerInfo's attempts to

obtain discovery of the amount of Domain Name's use or revenues from such use.  At the

Court's Estimation Hearing, the Court determined that the Debtor owned that name at some

point, and that by his conduct, breached his fiduciary duty to CCB Data creating the monetary

claim of $225,000.  As previously stated, this finding was limited for confirmation purposes

only.

    It is within these parameters that the Court provides the following analysis and additional

findings and conclusions regarding the confirmation of the plans.


## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 USC 1334 and 157(b)(2)(B).  Venue is appropriate under 28 USC 1408(a).  Notice of this hearing is appropriate in all respects.

## III.    ANALYSIS

The Court notes that in order to confirm a Chapter 11 plan, the plan proponent must show, by a preponderance of the evidence, that the plan complies with all applicable provisions of 11 U.S.C. § 1129(a).[11]  If the plan does not comply with one of the applicable provisions of section 1129(a),[12] the plan may not be confirmed.  The Court finds that the proponents of both plans have satisfied the requirements of sections 1129(a)(2), (a)(4), (a)(5), (a)(9), (a)(10), and (a)(12).  The Court further finds that sections 1129(a)(6) and (a)(13), are inapplicable to both plans.  However, sections 1129(a)(1), (a)(3), (a)(7), (a)(8) and (a)(11) are critical to this confirmation and the Court will address them in turn.

As a preliminary matter, however, the Court finds it necessary to address an issue that has been raised as to whether the Second Amended Joint Plan filed by ConsumerInfo and the Trustee should be re-circulated for voting.  The Court has reviewed the Second Amended Joint Plan and the accompanying Liquidating Trust Agreement, and determines that the proposed changes do not contain a material modification to the Joint Plan, which was reviewed by creditors before they cast their ballots.  Therefore, additional circulation and re-voting on the new Amended Plan is not necessary.  Furthermore, voting does not appear to be a critical issue in this case because all classes are being paid in full and are unimpaired, and therefore, their

---

[11]    *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir. 1986); *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc.*, 341 B.R. 298, 310 (10th Cir. B.A.P. 2006).

[12]    Unless otherwise noted, further references to "sections" refer to Title 11 of the United States Code, also known as the Bankruptcy Code.

votes are not critical to confirmation under section 1129(a)(8).  Accordingly, ConsumerInfo is

permitted to amend its plan for consideration without further notice or solicitation.  The same

goes for the amendments filed by SMDI, however, no challenge was made to these amendments.

A.      **Compliance with § 1129(a)(1)**

Under section 1129(a)(1), Chapter 11 plans must comply with all applicable provisions

of the Bankruptcy Code.  This is generally interpreted to mean that a plan must comply with

sections 1122 and 1123.[13]  However, additional arguments regarding other code sections have

been made.

1.      **The Joint Plan**

The Court finds that the Joint Plan complies with section 1129(a)(1) in that it complies

with sections 1122 and 1123(a), and all other applicable provisions of Title 11.  SMDI argues

that the Joint Plan violates section 502(a) because it allows the plan trustee to be the sole party

with standing to object to claims.  The Court finds that this argument has been addressed by the

relevant amendments to the Joint Plan.  Specifically, the Joint Plan has been amended to allow

SMDI to object to claims with the leave of Court in the event that there are monetary recoveries

in the pending AP and where the Trustee has elected not to object to Class 3 claims.  Further,

under the present AP, ConsumerInfo is a co-plaintiff.  The Court believes that SMDI could seek

appropriate relief contesting ConsumerInfo's acquired claims by filing appropriate permissible

counterclaims.  The Court has previously alerted SMDI to this option, however, SMDI has

elected not to seek this type of recovery.  In addition, the Court determines that the objections to

claims 27 and 42 are not being disallowed, but that their objections are deferred.

---

[13]      *See* H.R. Rep. No. 595, 95th Cong., 1st Sess., 412 (1977); S. Rep. 989, 95th Cong., 2d Sess., 126 (1978).

15

SMDI also argues that the Joint Plan violates section 550 and the APA, because it prevents the Trustee from accepting a monetary judgment in lieu of the Domain Name through the AP. The Court disagrees with SMDI's interpretation of section 550. That section provides, in relevant part, that "the trustee *may* recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property . . . ."[14] Therefore, section 550 does not obligate the Trustee to accept a monetary recovery in prosecuting an action, but gives the Trustee discretion to seek whichever form of recovery that he deems most beneficial to the estate.

The Court further finds that there is a reasonable basis for the Trustee to convey the Domain Name to ConsumerInfo, if recovered, because the Trustee is obligated to do so under the APA. When the Court approved the Sale Motion brought by the Trustee in December of 2006 and authorized the sale of a co-interest in the Trustee's AP seeking recovery of the Domain Name, a detailed APA was carefully reviewed and considered by the Court. In approving the sale, the Court considered a number of factors and determined that the proposed sale would result in an immediate benefit to the Chapter 11 estate sufficient to pay most, if not all, of the claims in this case.[15] The Court also relied on Trustee's business judgment in weighing the opposing offers from SMDI and ConsumerInfo, and found that the offer from ConsumerInfo was superior to SMDI's because SMDI's offer involved installment payments and there was sufficient doubt as to SMDI's ability to perform under its competing offer.[16] The Court's Order

---

[14]    11 U.S.C. § 550 (emphasis added).

[15]    Mem. Decision at 11.

[16]    *Id.*

16

approving that sale was never appealed by SMDI. The terms and provisions of that Sale Order

and the resulting APA are now the law of this case and cannot be challenged unless and until

reversed or modified by a judgment order following a Rule 59 or Rule 60(B) motion.[17] Neither

has occurred in this case. To a certain extent, that ruling is a driving force in the case at the

present time.

Moreover, an additional factor suggests that the Court should exercise its discretion

under section 550 and order the recovery of the Domain Name if the Trustee ultimately prevails

in the AP. One of the provisions of the APA requires specific performance by the Trustee.

Accordingly, the discretion given to the Trustee and the Court under section 550 has been

properly addressed and exercised in the Joint Plan.

SMDI further alleges that the Joint Plan violates section 1104 because it impairs the

Trustee's ability to properly exercise his duties and ignores the disinterestedness requirement of

the Trustee. The Court finds that this argument has been addressed by the relevant amendments

to the Joint Plan. Specifically, section 2.2 of the Liquidating Trust Agreement has been modified

to remove any power by ConsumerInfo to direct the liquidating trustee. The Court has

previously ruled on that point in connection with the various motions to allow SMDI to object to

claims and even in connection with the Sale Order. The Court determines that under the

circumstances of this case, the Trustee is disinterested. The Trustee has broad discretion and the

Court does not find that such discretion has been abused.

SMDI also argues that the Joint Plan violates section 328, because under the plan the

Trustee is not required to obtain court approval for post-confirmation fees. The Court disagrees,

---

[17]    Fed. R. Civ. P. 59 & 60.

and finds that if the Joint Plan is confirmed then no court approval for fees would be required

because the language of the plan, which eliminates this requirement, would govern—only pre-

confirmation fees require court approval.

SMDI finally alleges that under section 1123, there has been an inappropriate treatment

of claims in the Joint Plan. The Court finds, however, that with the amendments made by the

Joint Plan proponents, the Joint Plan does not violate section 1123.

## 2.    The SMDI Plan

The Court finds that SMDI's plan does not comply with section 1129(a)(1) in the

following particulars.  Specifically, Article 3 of the SMDI plan classifies ConsumerInfo in Class

2A as a separate class from other unsecured creditors for its acquired claims from CCB Data

Corp. (i.e. claims 27 and 42).  Section 1122(a) requires claims that are substantially similar to be

placed in the same class.  The Court has estimated claim 42 to be valued at $225,000 as an

unsecured claim, and claim 27, although not challenged, to be valued at $131,800 as an

unsecured claim, for a total amount of $356,800 for both claims.  Based on the arguments of

SMDI's counsel, the reason for the disparate classification by SMDI appears to be based on a

statement of Mr. Robert Richards while testifying in Court on October 13, 2006.  At that hearing,

Mr. Richards admitted that ConsumerInfo was more interested in acquiring the Domain Name

than serving the interests of creditors.  The Court does not believe that this is a valid basis for a

separate classification of ConsumerInfo's claims.

Additionally, the SMDI Plan classifies the unsecured claims it acquired in Class 2B of its

plan, while all other unsecured creditors are classified in Class 2C.  Should the Court determine

18

that unsecured creditors under the SMDI Plan are not being paid in full, and are thus impaired,

then this separate classification becomes material and would require additional analysis.

The Court recognizes, however, that this might make little difference here because

SMDI's plan purports to pay all creditors, including ConsumerInfo's claims acquired from CCB

in full, so they would be unimpaired and classification and/or gerrymandering to get an

accepting class may not be an issue.

### B.    Compliance with § 1129(a)(3)

Section 1129(a)(3) requires that the plan be proposed in good faith and not by any means

forbidden by law.  Good faith is not defined in section 1129(a)(3), but it is generally interpreted

by the Tenth Circuit to mean that "there is a reasonable likelihood that the plan will achieve its

intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the

plan feasible or practical."[18]  Notwithstanding the enactment of the Bankruptcy Abuse

Prevention and Consumer Protection Act (the "BAPCPA") and other Supreme Court decisions,

*In re Pikes Peak* is the controlling law on the issue of good faith in this circuit.  It is noted that

SMDI also points out that section 1129(a)(3) includes "and not by any means prohibited by law."

There does not appear to be any case-law within the Tenth Circuit addressing this particular

prong of section 1129(a)(3), other than *In re Pikes Peak* which defines the good faith

requirement of section 1129(a)(3).  Therefore, the Court will rely on *In re Pikes Peak* in also

addressing this argument.  It is important to note that *In re Pikes Peak* has not been reversed or

modified, and is, therefore, binding on this Court.

### 1.    The Joint Plan

---

[18]    *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1459 (10th Cir. 1985).

19

SMDI has argued several points, and indeed, the bulk of its argument during the

confirmation hearing focused on whether the Joint Plan is being proposed in good faith and not

by any means forbidden by law.  The Court addresses these arguments one at a time.

SMDI has presented extensive evidence and arguments regarding ConsumerInfo's

alleged lack of good faith in proposing the Joint Plan.  The evidence presented concerns the

communications initiated by the Debtor with ConsumerInfo's counsel and alleged "side deals"

made during those discussions to subvert SMDI's efforts in filing a joint plan with the Debtor.

SMDI argued that these improper communications took place at a critical time in the case when

the Court was deciding the sale motion, and SMDI's inability to file a plan with the Debtor due

to ConsumerInfo's improper interference impacted the Court's decision to approve the sale of an

interest in the AP  to ConsumerInfo.  SMDI has argued that the APA and the Joint Plan are the

fruits of ConsumerInfo's wrongful conduct, which it argued, should persuade the Court to deny

confirmation of the Joint Plan on the grounds that it is being proposed in bad faith.

In support of its position, SMDI relies on *Featherstone v. Schaerrer*[19] and *Shearson*

*Lehman Bros., Inc. v. Wasatch Bank*,[20] where the trial court found that sanctions or suppression

of evidence is appropriate when counsel engages in inappropriate *ex parte* communications with

the opposing party it knows to be represented by counsel without the knowledge or consent of

that party's counsel.  SMDI argues, by analogy, that the Court should sanction ConsumerInfo.

In the present situation, Mr. Paige is not a party to the case.  Moreover, at the time of the

alleged communications Mr. Paige was not a debtor-in-possession because a Chapter 11 Trustee

---

[19]    34 P.3d 194, 203 (Utah 2001)

[20]    139 F.R.D. 412, 414 (D. Utah 1991)

20

had been appointed in the case.  In fact, SMDI conceded to this point during the October 5, 2007

confirmation hearing when its counsel objected to Mr. Gillman's[21] examination of Ms. Barbara

Smith, SMDI's accountant, arguing that Mr. Paige is not a proponent of either plan and "has no

real dog in this fight."[22]  Additionally, Mr. Paige was the one who initiated all contact with

ConsumerInfo, and had indicated to ConsumerInfo that he was not represented by counsel and

was in need of substitute counsel because his counsel at the time, Mr. Hyde, wanted out of the

case.  Alternatively, Mr. Paige was playing SMDI against ConsumerInfo by trying to finagle a

deal for himself.  Whichever may be the case, the Court finds the rulings in the cases cited by

SMDI are distinguishable from the present situation and are not applicable.

Mr. Paige testified that during this time period, he wanted a job or a consulting

agreement with ConsumerInfo and that he was pushing to get something in exchange for helping

ConsumerInfo if it was successful in purchasing the Domain Name from the estate.  He further

testified that ConsumerInfo's counsel never initiated any contacts with him but that

ConsumerInfo agreed to fund the retainer for his new counsel after he pushed them for it.

However, this offer to fund the retainer of substitute counsel came after Mr. Paige became

dissatisfied with Mr. Hyde.

To Mr. Hyde's credit, it appears that he was left in the dark about much of Mr. Paige's

contacts with ConsumerInfo.  In fact, Mr. Hyde advised Mr. Paige not to contact ConsumerInfo.

Furthermore, Mr. Hyde had even taken steps to prepare a plan of reorganization and a disclosure

statement, but was advised by Mr. Paige not to file them.  Mr. Hyde did meet with Mr. Paige a

---

[21]     Mr. Gillman substituted Mr. Hyde and is the Debtor's current counsel.

[22]     Obj. of M. Zundel to Gillman's Examination, Oct. 5, 2007.

few days before the December 7, 2006 hearing on the sale motion.  According to Mr. Hyde's testimony, Mr. Paige and he discussed the upcoming hearing and Mr. Paige left Mr. Hyde with the impression, at that meeting, that he was to object to the sale motion.  However, from what the Court has observed and heard, Mr. Paige was secretly meeting with his new counsel, seeking alternative advice without Mr. Hyde's knowledge, and attempting to secure a good deal for himself.  Mr. Paige elected not to attend the sale hearing and the Court observed and commented on this fact.  Mr. Hyde, however, appeared after he had filed the objection and argued against the sale.  The next day Mr. Hyde withdrew and Mr. Gillman entered his appearance as counsel for Mr. Paige.  All of these developments strongly suggest to the Court that Mr. Paige was not forthright with Mr. Hyde.  Mr. Paige was scrambling to get the best deal for himself, and he clearly had no concern for the creditors.

During the sale hearing on December 7, the Court asked counsel for SMDI why it had not filed a plan of reorganization prior to the sale hearing.  SMDI responded that it was acting under the mistaken belief that the Debtor had the exclusive right to file a plan after conversion of the case to one under Chapter 11.  SMDI determined that only the Debtor had the exclusive right to file a plan and SMDI was waiting on the Debtor to file a joint plan.  SMDI has since acknowledged that this interpretation was incorrect.  Since the Court had appointed a Chapter 11 Trustee, this terminated the exclusive right of the Debtor to file a plan during the first 120 days after the conversion.  Accordingly, SMDI's suggestion that it was somehow prejudiced in waiting for the Debtor to file a plan during this time period is unavailing.  It is the Court's determination that if SMDI was prejudiced between October 13 and December 7, it was because of Mr. Paige's conduct and not because of any wrongdoing by ConsumerInfo or its counsel.

22

During the course of the confirmation hearings, on an objection to certain evidence presented by SMDI, the Court ruled that much of SMDI's lack of good faith arguments and supporting evidence were irrelevant.  At one point during the hearing, counsel for SMDI argued that the Court should admit into evidence certain transcriptions of voicemails left by Mr. Paige for ConsumerInfo's counsel contained in Exhibit 143.  SMDI argued that although the transcribed messages did not show any evidence of bribery, these were evidence of discussions preliminary to a bribe from ConsumerInfo.  In relying on the Tenth Circuit's decision in *In re Pikes Peak*, the Court determined that "the test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions."[23]

With that standard in mind, the Court ruled that under the facts of this case, neither the communications between Mr. Paige and ConsumerInfo nor any other conduct by ConsumerInfo between October 13 and December 7, served as sufficient grounds for finding that the Joint Plan was not being proposed in good faith or by any means forbidden by law and sustained the objection to the admission of Exhibit 143.  The Court has reaffirmed this finding in its ruling on October 1, 2007, during the hearing on SMDI's Motion to Compel Testimony of ConsumerInfo's counsel.  The Court has heard Mr. Paige's testimony during direct and cross examination, and the Court is not persuaded that anything discussed between Mr. Paige and ConsumerInfo's counsel should require the Court to make a finding of lack of good faith on the part of the Joint Plan proponents in filing their plan.  Furthermore, as the Court observed earlier,

---

[23]        *In re Pikes Peak*, 779 F.2d at 1459.

23

neither ConsumerInfo nor its counsel had made any promises to the Debtor or bribed the Debtor.

The Court is not persuaded to change its prior rulings on this issue.

SMDI further reminds the Court of its Memorandum Decision Granting Trustee's motion

to sell issued on December 8, 2007, where the Court expressed "concerns about the propriety of

ConsumerInfo's motivation in paying for the Debtor's retainer, and its contacts with the Debtor

without the presence of counsel."[24]  The Court finds that any concerns of the Court expressed at

its December 13, 2006 hearing have been addressed and allayed by the Joint Plan proponents in

the evidence presented.

Even if SMDI's allegations of improper influence of the Debtor by ConsumerInfo

survived the Sale Order, the Court is not persuaded by them.  The Debtor initiated several

contacts with ConsumerInfo and/or its counsel.  The Debtor as a lay person was reasonably

under the impression that he either had no counsel between October 13 and December 4, 7 and 8,

or that he needed to get substitute counsel.  Alternatively, the Debtor was playing coy with both

SMDI and ConsumerInfo, suggesting that he did not have counsel when it could be interpreted to

be in his favor.  As the Court pointed out earlier, there is some confusion as to whether or not the

Debtor was represented by counsel during this period in question because Mr. Hyde had filed an

objection when the Debtor thought Mr. Hyde was no longer representing him and had indicated

so during his discussions with ConsumerInfo.

Although ConsumerInfo funded the retainer for Debtor's substitute counsel and

communicated with the Debtor at an allegedly critical time, the Court is not convinced that this

---

[24]      Mem. Decision at 5 n. 3.

type of conduct equates to a finding that the joint plan was not proposed in good faith or by any means forbidden by law.  The Court does find that Mr. Paige's conduct during the period between October 13 and December 7 was extraordinary.  He was not looking out for the best interests of creditors but was only concerned about securing a good deal for himself.  Mr. Paige was the one soliciting a monetary package from ConsumerInfo.  The Court finds any allegations of attempted bribery of Mr. Paige or subversion of a purported joint plan by the Debtor and SMDI unsubstantiated.  Specifically, SMDI's counsel characterized the conversations between Mr. Paige and ConsumerInfo's counsel as "prospective bribery" or "anticipatory bribery." However, the Court has not heard any evidence of bribes being offered by ConsumerInfo to Mr. Paige.  The Court finds Mr. Paige to be very resourceful and energetic in soliciting both companies.  Mr. Paige ignored the advice of his own attorney and kept his attorney in the dark regarding his contacts with ConsumerInfo. On the basis of the record in this case, Mr. Hyde continued to serve as counsel to Mr. Paige until December 8, 2006.  Therefore, ConsumerInfo's attorneys should have known that between October 13 and December 8, 2006, Mr. Paige was being represented by counsel, and their communications with Mr. Paige may have been improper under the Utah Code of Professional Conduct.  However, engaging in these communications, albeit possibly improper under ethical rules, does not translate into filing of a plan by "means forbidden by law" and not in "good faith" eight months later.

The Joint Plan was filed almost eight months after the sale hearing of December 2006.  The passage of that much time erodes and waters down much of the argument that SMDI has made about ConsumerInfo's plan not being filed in good faith.  Additionally, SMDI's failure to appeal the sale order, the absence of a motion to vacate or reconsider the Sale Order by SMDI

under Rules 59 or 60(b),[25] combined with the fact that the Debtor was no longer in possession at the time of the alleged improper contacts, strongly suggest that SMDI's objection on the basis of lack of good faith should be overruled.

Lastly, even if there were improper contacts between ConsumerInfo's attorneys and Mr. Paige, a disciplinary action and possible sanctions by the Utah State Bar Association appear to be the appropriate remedy, not a finding of violation of section 1129(a)(3).

As stated earlier, finding of good faith turns on the determination of whether the plan is feasible or practical under the *Pikes Peak* case test from our circuit, or otherwise achieves its intended results, which are consistent with the purposes of the Bankruptcy Code. Thus, even if SMDI's allegations of improper conduct by ConsumerInfo are true, these alleged improper actions have little bearing on the Court's determination of whether ConsumerInfo's and Trustee's Joint Plan was or was not filed in good faith pursuant to section 1129(a)(3).

The Court finds that if the Joint Plan is feasible and sets out to achieve the plan's intended result, it meets the good faith test of section 1129(a)(3). In this case, the Joint Plan is funded by cash on hand with the Trustee and provides for sufficient funds provided by ConsumerInfo to cover the necessary litigation expenses of the liquidating trustee in prosecuting the pending AP. Additionally, the Joint Plan proposes to pay all creditors in full and allocates an additional $300,000 , also provided by ConsumerInfo, plus 10% interest to satisfy Class 2 claims. Thus, the Joint Plan appears both feasible and workable. Accordingly, yhe Court finds that Joint Plan, as amended, complies with section 1129(a)(3).

## 2.    The SMDI Plan

---

[25]    FED. R. CIV. P. 59 & 60.

The Court finds that SMDI's plan does not comply with section 1129(a)(3) in the

following particulars.  The Chapter 11 Trustee effected a sale of an interest in the AP, which

seeks to recover the Domain Name.  On December 13, 2006, the Court entered an order pursuant

to sections 363(b) and (f) authorizing the Trustee to sell this interest free and clear of all liens

and claims.  No appeal was taken of that order.  As stated earlier, that order is now final and non-

appealable, and remains the law of the case.  That sale closed and ConsumerInfo paid the Trustee

$1.9 million in exchange for an interest in the AP.  The provisions of the SMDI Plan providing

for dismissal of the AP, and impliedly, for the settlement of the claims in the AP are not

consistent with the terms of the sale under sections 363(b) and (f) and the Court-approved APA.

SMDI argues, that its plan does not violate or breach the APA or the Sale Order.

Specifically, SMDI argues that as a party in interest with standing to propose a plan, it has the

ability to propose a settlement of claims through a plan pursuant to section 1123(b)(3).  The

Court disagrees with SMDI's interpretation, and believes that "settlement" as used in the context

of section 1123(b)(3) refers to the settlement of pre-petition claims and disputes or actual

settlements, not final and non-appealable sale orders.

The Court further finds that the proposed settlement of the APA in SMDI's plan goes

further than what is permitted under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

In a case from the Delaware Bankruptcy Court, Judge Walrath analyzed section 1123(a)(3) and

found that "[w]here a compromise and settlement is part of a plan of reorganization the Court

has the duty to determine that a proposed compromise forming part of a reorganization plan is

fair and equitable."[26]  "The standards for approval of a settlement under section 1123 are

---

[26]         *In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (D. Del. 2004).

generally the same as those under Rule 9019 . . . ."[27]  The Court is persuaded by this analysis.

Rule 9019 provides the procedures for an approval of a compromise and settlement.[28]  The SMDI

Plan compels a settlement of a litigation where SMDI acts as a defendant.  Rule 9019, however,

provides that only the Trustee may move for approval of a compromise and settlement.[29]

Furthermore, under the court-approved APA, the Trustee can only do so after first consulting

with ConsumerInfo.  Here, the Trustee, in fact, opposed the settlement proposed in SMDI's plan.

While a settlement may be encouraged, it cannot be involuntarily imposed on the Trustee or

ConsumerInfo.

Moreover, the case of *In re Kopexa Realty Venture Co.*,[30] decided by the Tenth Circuit

Bankruptcy Appellate Panel, requires the Court to make findings for approvals of settlements.

Under *Kopexa*, in order to approve a settlement the Court must find (1) that in litigated matters,

the probability of success on the merits is in doubt, (2) that should the Trustee be successful in

the litigation, collection is in doubt or would be difficult, (3) that the costs of pursuing the

litigation coupled with the complexity of the issues involved strongly favor approval of the

settlement, and (4) that the settlement is in the best interest of creditors.[31]

The Court believes that there has been inadequate showing of doubt of success on the

merits of the AP.  Although bits and pieces of that AP were presented here, it was insufficient to

show that the Trustee will not be successful on the merits.  Additionally, there has been no

---

[27]     *Id.; See* FED. R. BANKR. P. 9019.

[28]     *See* FED. R. BANKR. P. 9019.

[29]     FED. R. BANKR. P. 9019(a).

[30]     213 B.R. 1020, 1022 (10th Cir. B.A.P. 1997).

[31]     *Id.*

showing of difficulty of collection if the Trustee were successful in litigating the AP. However,

there has been a sufficient showing that substantial litigation costs have been and will continue

to be incurred by both plan proponents in pursuing the AP, which weighs in favor of settlement.

There has also been adequate showing of the complexity of issues and SMDI's defenses.

However, there has been inadequate showing that the settlement would be in the best interest of

creditors. Although no particular weight is given to any of these factors, the Court believes that,

absent the Trustee's support and initiation, there has been inadequate compliance with Rule

9019. The Court further finds that the lack of evidence on the other points would requires the

Court to find that the settlement should not be approved.

   As another basis for finding a lack of good faith in proposing the SMDI's plan, the Court

believes that the Trustee owes a duty of good faith and fair dealing to ConsumerInfo pursuant to

the Sale Order and the APA. The Trustee is obligated to comply with the specific performance

clause of the APA, which requires the Trustee to deliver the Domain Name if he is successful in

the AP. As a final, non-appealable order, the Trustee is bound to perform under to the Sale

Order. The Joint Plan recognizes the enforceability of that order and allows the APA and the AP

to continue. Sale Orders should be enforced. The settlement proposed in the SMDI Plan could

easily be construed as a breach of Trustee's duties. In effect, the SMDI Plan overrules the Sale

Order without going through an appeal.

   SMDI argues that the APA authorizes the Trustee to unilaterally dismiss the AP and

refund $1.825 million to ConsumerInfo under paragraph 1.5 of the APA. The Court does not

read the APA to authorize the Trustee to do this without first showing some cause. The APA

must be read in its entirety, and not just isolated provisions as suggested by SMDI. Other

provisions of the APA, including (1) paragraph 4.2 requiring the Trustee to take all steps

necessary to proceed diligently and in good faith to satisfy each condition of the APA, (2) the

portion in paragraph 1.5 requiring the Trustee to prosecute the AP in good faith, (3) paragraph

11.10 requiring each party to use reasonable, good faith efforts to do all things necessary to see

that the conditions of the APA are satisfied, (4) paragraph 8.2(b) requiring the Trustee to transfer

the Domain Name to ConsumerInfo at a subsequent closing without additional consideration,

and (5) paragraph 8.4 requiring specific performance, all persuade the Court that a dismissal by

the Trustee without showing any cause or excuse is not what was bargained for or allowed by the

APA.  The Court further determines that the dismissal and refund provisions of the APA may

only be triggered by the Trustee after he concludes that (1) further pursuit of the claims in the AP

are meritless or (2) the costs of proceeding are so excessive that the recovery would not justify

the costs.  The Trustee has not made that determination yet and, in fact, the evidence indicates

that the Trustee has determined to pursue the AP further.  Therefore, dismissal under the SMDI

Plan is inconsistent with the APA.

Finally, SMDI argues that it should not be bound by the Sale Order, and that by filing its

Plan it has followed the necessary procedures for challenging that Order.  SMDI asserts that

under Rule 60(b) of the Federal Rules of Civil Procedure, it may contest the Sale Order by an

independent action.  It further contends that its plan constitutes an "independent action" within

the scope and meaning of Rule 60(b).[32]  The Court disagrees.  The Court determines that an

independent action requires either a filing of a specific motion identifying the relief sought under

Rule 60(b), or filing of an AP with the accompanying procedural rights that are available under

---

[32]         FED. R. CIV. P. 60.

the bankruptcy rules.  SMDI's plan does not constitute a motion or an independent action within the meaning of Rule 60(b).  The Court is aware of *In re Gledhill*,[33] which is one of the Court's most favorite decisions because (1) the Court refers to it as the Big Rock Candy Mountain case and (2) it is an examples of a courageous move by the Trustee.  The holding in *Gledhill* is consistent with this ruling today that although a party is not required to file an AP to obtain relief from a final judgment, a party is, nevertheless, required to file a motion to this effect, which SMDI has not done.  Rule 7(b) of the Federal Rules of Civil Procedure, which governs the requirements for all motions, provides that any motion shall be made in writing, shall state with particularity the grounds thereof, and shall set forth the relief of order sought.[34]  In this case, SMDI's plan does not qualify as a "motion" within the meaning of Rule 7(b) because it fails to state with specificity the grounds for setting aside or vacating the Sale Order.  In fact, SMDI makes no mention of the Sale Order anywhere in its plan.  Although section 5.6 of SMDI's plan discusses dismissal of the AP, this section makes no specific reference to the Sale Order or the dismissal of that order.

Even if the Court were to broadly and liberally interpret the filing of SMDI's plan as an independent action within the meaning of Rule 60(b), the Court is not persuaded that the Sale Order should be vacated.  The Court is generally bound by final sale orders.  A court of equity may set aside a sale order either before or after confirmation when it appears that the same was

---

[33] 76. F.3d 1070, 1078 (10th Cir 1996).

[34] *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1185 (10th Cir. 1999)

31

entered through mistake, inadvertence, or improvidence, or upon a showing that the price

obtained shocks the conscience.[35]

As stated earlier, prior to approving the Trustee's sale motion and authorizing the sale of

the co-interest in the AP to ConsumerInfo, the Court conducted a two-day evidentiary hearing on

that matter and carefully considered the APA detailing the terms of the sale.  Based upon the

evidence presented at the sale hearing, the Court made extensive findings approving the sale in a

Memorandum Decision issued on December 8, 2006.  There has been no showing, since the

entry of the Sale Order, that the sale was approved by mistake or inadvertence, or that the Sale

Order lacked adequate evidentiary basis.  Furthermore, there has been no evidence presented

showing that the purchase price of $1.9 million obtained from ConsumerInfo was "so grossly

inadequate as to shock the conscience of the Court."[36]  Relief under Rule 60(b) should only be

granted upon a showing of exceptional circumstances.[37]  The Court finds that SMDI has not

carried its burden of showing that such exceptional circumstances exist in this case.

Accordingly, the Court finds that SMDI is not entitled to relief under Rule 60(b).

All of this persuades the Court that the SMDI Plan is not proposed in good faith, and that

the Joint Plan is proposed in good faith and not be any means prohibited by law.

**C.      Compliance with § 1129(a)(7)**

---

[35]      *In re BCD Corp.*, 119 F.3d 852, 860 (10th Cir. 1997)

[36]      *Id.*

[37]      *In re Vision Metals, Inc.*,  311 B.R. 692, 698 (Bankr. .D. Del. 2004).

Section 1129(a)(7) requires that the plan either be accepted by each impaired class, or

provide that each non-accepting member receive at least as much as they would in a Chapter 7

liquidation.[38]

### 1.      The Joint Plan

SMDI has presented evidence and has vigorously argued that the Joint Plan violates

section 1129(a)(7) because it does not provide the Chapter 7 equivalent treatment to SMDI as the

holder of the Debtor's residual interest in the estate.  SMDI argues that in a hypothetical Chapter

7 case, on account of its residual interest, it would receive all of the excess monetary recoveries

payable to the estate from the AP after payment of Class 2 and 3 claims in full.  Based on the

testimony of its accountant, Barbara Smith, SMDI has estimated the value of the AP to be at $2.6

million.[39]  Therefore, SMDI argues that its treatment as a residual interest holder would be much

greater in a hypothetical Chapter 7 liquidation than under the Joint Plan because under the Joint

Plan it would receive little or nothing.  Additionally, SMDI argues that it is prejudiced by the tax

provisions in the Liquidating Trust Agreement that accompanies the Joint Plan.

The Court, however, is not persuaded by these arguments.  The Court finds the evidence

to be unclear and incomplete as to the valuation of the AP, and SMDI's assessment of the tax

consequences to the estate under the Joint Plan when compared to those arising in a hypothetical

Chapter 7 liquidation.  The Court accepts the testimony of ConsumerInfo's expert, Mr.

Vandertoolin, a CPA who testified that there would be no adverse tax consequences to the

---

[38]      11 U.S.C. § 1129(a)(7).

[39]      *See* Ex. 185; *see* R. Test. of Barbara Smith.

classes under the Joint Plan as a result of disbursements to them using the Liquidating Trust

Agreement accompanying the Joint Plan.

The Court further finds that SMDI's valuation of the AP at $2.6 million is not adequately

supported by the evidence presented at the confirmation hearing because it is merely a

calculation of the amount that ConsumerInfo has paid for the interest in the AP, plus the

additional amounts necessary to fund the plan.  When SMDI's expert was cross-examined on this

point, she indicated that she had not read the complaint or the answer in the AP.  Therefore,

SMDI's valuation of the AP at $2.6 is  not adequately substantiated.  Although Ms. Smith has

provided admissible and helpful evidence as to the accounting of claims and costs of the SMDI

plan as well as a comparison to a hypothetical Chapter 7 liquidation, her valuation of $2.6

million for the AP has to be viewed as a tax analysis only.  It does not take into consideration the

legal theories involved in the litigation, including the various uncertainties that may exist.

To say that the Domain Name has additional value is also speculative.  The Domain

Name was sold for $1.9 million last December in a Trustee sale.  Although it was characterized

as an interest in the AP, no further consideration will be due if the Trustee wins, accordingly, it

cannot be valued twice.  Thus, SMDI's valuation of the AP and any monetary recoveries from

the AP are merely speculative.  In fact, SMDI has denied any liability in the AP or that there

would be any damages arising from its post-January 2006 use of the Domain Name.  SMDI has

consistently refused to disclose the profits or revenues that it has generated from its post-January

2006 use of the Domain Name.  Without this information, it is impossible to determine the value

of the claims in the AP, and consequently, the amount that might flow to the residual interest

holder.

34

Further, Exhibit CCC includes an analysis by the Trustee showing cash available of approximately $1.856 million with liabilities of approximately $2.288 million (without interest), resulting in a deficit of approximately $432,000 before the Chapter 7 administrative costs are added.  The Court finds that Trustee's Chapter 7 analysis is persuasive, and adopts this analysis as the most likely result in a hypothetical Chapter 7 liquidation.  Specifically, the Court finds that SMDI, as the residual interest holder, would mostly likely receive nothing in a hypothetical Chapter 7 liquidation.  SMDI's argument that the Joint Plan fails to preserve and provide for the liquidation value of the residual interest holder of millions of dollars as of the effective date of the plan is unavailing.  SMDI has relied on the *Hoosier*,[40] *Featherworks*[41] and *Adelphia*[42] cases for the proposition that the Joint Plan proponents have not carried their burden in showing that the residual interest held by SMDI has been properly addressed.  The Court disagrees and determines that under a liquidation on the effective date, the interest that SMDI has acquired from the Debtor would receive little or nothing, and the Trustee has carried his burden of showing the same.

Further, no evidence was presented by SMDI as to the relative costs of administration in Chapter 7.  Those costs could be substantial, including the costs of litigating claims allowances and the time value of money caused by an additional delay.  Accordingly, contrary to SMDI's assertions, the Court finds that the Joint Plan does comply with section 1129(a)(7).

2.    **The SMDI Plan**

---

[40]    *In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34 (Bankr. S.D. Ind. 1986).

[41]    *In re Featherworks Corp.*, 25 B.R. 634 (Bankr. E.D.N.Y. 1982).

[42]    *In re Adelphia Commc'ns Corp.*, 361 B.R. 337 (S.D.N.Y. 2007).

Based on the Court's review of the SMDI Plan, and in the absence of any objections to the plan on the basis of section 1129(a)(7), the Court finds that SMDI's plan satisfies the requirements of section 1129(a)(7).

### D.   Compliance with § 1129(a)(8)

Under section 1129(a)(8), the plan must be accepted by all impaired classes.  However, the condition set forth in section 1129(a)(8) is not absolutely necessary for confirmation.[43]  "If a plan satisfies the confirmation criteria set forth in section 1129(a), including the requirement that if a class of claims is impaired, at least one impaired class of claims accepts the plan, the plan may be confirmed notwithstanding the opposition of one or more impaired classes of claims or interests, provided the plan satisfies section 1129(b)."[44]  Under section 1129(b)(1), the plan must be "fair and equitable" and not unfairly discriminatory as to the dissenting class.[45]  Where the dissenting class includes the residual interest holders, a plan is deemed fair and equitable if (i) the plan provides that each holder of such interest receives property of value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to such class doe not receive any property under the plan.[46]

### 1.   The Joint Plan

---

[43]   COLLIER ON BANKRUPTCY § 1129.03[8] (15th ed. 2007).

[44]   *Id.*

[45]   11 U.S.C. § 1129(b)(1).

[46]   11 U.S.C. § 1129(b)(2)(c).

The Court finds that the Joint Plan does not satisfy section 1129(a)(8) as to Class 4, which is the class of residual a interest-holder held by SMDI because Class 4 has rejected the Joint Plan and is impaired.  Notwithstanding the existence of an impaired, rejecting class, the Court finds that confirmation of the Joint Plan is appropriate under section 1129(b).  The Court finds that the Joint Plan does not discriminate unfairly in that all similar claims are treated the same, and the Joint Plan is "fair and equitable" to Class 4.  Specifically, the Joint Plan provides that Class 4 interest-holder will receive, on account of such interest, property of value as of the effective date of the plan equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled and a fixed redemption price to which such holder is entitled, or the value of such interest.  Additionally, the holder of any interest that is junior to the interest of Class 4 interest- holder will not receive or retain on account of such junior interest any property.  Accordingly, the Court finds that the Joint Plan satisfies the requirements of section 1129(b) as to the  rejecting classes of claims and interests.

       **2.      The SMDI Plan**

The Court finds that the SMDI Plan complies with section 1129(a)(8).

**E.      Compliance with § 1129(a)(11)**

Under section 1129(a)(11), the plan must be feasible in order to be confirmed.[47]

       **1.      The Joint Plan**

The Court finds that the Joint Plan complies with section 1129(a)(11).

---

[47]      11 U.S.C. § 1129(a)(11).

2.      **SDMI's Plan**

The Court finds that SMDI's plan does not comply with section 1129(a)(11) because it does not provide adequate funding for ConsumerInfo's contingent administrative claim that could arise from the breach of the APA.  An administrative claim could arise if the SMDI Plan is confirmed to the extent that it requires a dismissal of the AP.  As discussed earlier, the dismissal of the AP would cancel the Sale Order and cause a breach of the APA, which was approved by the Court in December 2006.  ConsumerInfo bargained for certain rights and remedies under the APA.  One of those rights was for the Trustee to continue to prosecute the claims set forth in the AP to acquire and/or resolve title to the Domain Name in the name of the estate and upon doing so, the Trustee would be required to transfer that title to ConsumerInfo at a subsequent closing. That bargained for right is eliminated under SMDI's plan.  Upon the dismissal of the AP as proposed in the SMDI Plan, ConsumerInfo has indicated that it would file a claim for damages for breach of contract against the estate.  This type of claim, if proven, would be entitled to administrative priority.[48]  Thus, payments to all classes would be deferred until that claim is resolved.  Although it is uncertain what amount that claim might be, there would be at least defense costs to the estate or to the plan trustee that would be an administrative claim entitled to payment.

Seeing how much the parties have expended so far in this case, the Court estimates that the cost of objecting alone would be very substantial.  The SMDI Plan allocates only $20,000 to

---

[48] *See In re Finevest Foods, Inc.*, 159 B.R. 972, 980 (Bankr. M.D. Fla. 1993) (finding purchaser of substantially all of the debtor's assets entitled to administrative claim for damages incurred as a result of debtor's breach of warranty in asset purchase agreement); *IML Freight Props., Inc. v. Interstate Rental of Utah, Inc.*, 37 B.R. 556, 559 (Bankr. D. Utah 1984) (concluding that damages arising out of debtor's breach of post-petition agreement are treated as an administrative expense); *In re Merry-Go-Round Enters., Inc.*, 180 F.2d 149, 155 (4th. Cir. 1999) (finding that damages arising out of debtor's breach of lease entered into post-petition are entitled to administrative priority).

the plan trustee for administering the Plan.  That amount, however, would most likely be

insufficient to contest the administrative claim.  Thus, the Court finds that SMDI has been

unable to show that its plan provides sufficient funding to provide for defense costs or to satisfy

the monetary judgment that could result from the allowance of an administrative claim by

ConsumerInfo.  The evidence shows that SMDI has $2.5 million in a funding account that is

available to fund its plan.  Its plan shows that there is approximately $2,442,315 that must be

paid out immediately upon confirmation, which assumes the payment to ConsumerInfo of

$1,875,000.

        If the plan Trustee disburses immediately to the classes under the SMDI Plan, it is likely

that should ConsumerInfo be successful on its administrative claim, the plan trustee would need

to seek disgorgement from all creditors who had been paid.  Such a situation creates a great

amount of uncertainty and would be very costly for the estate, and may ultimately be

unsuccessful.  Therefore, for the reasons articulated above, the Court finds that SMDI's plan

does not satisfy the requirements of section 1129(a)(11).

**IV.    CONCLUSION**

        Accordingly, the Court finds that the Joint Plan of Consumer Info and the Trustee

satisfies the applicable requirements of section 1129(a), and should be confirmed, while the

SMDI Plan does not and should not be confirmed.  Orders were preliminarily entered after the

Court made its oral ruling from the bench, which were consistent with this Memorandum

Decision.  The Court reserved the right to issue this Memorandum Decision at a later date which

it does now.

_____END OF DOCUMENT_____



_____oooOooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

MICHAEL N. ZUNDEL
ADAM S. AFFLECK
ANDREW B. CLAWSON
PRINCE, YEATES & GELDZAHLER
CITY CENTRE I, STE. 900
175 EAST 400 SOUTH
SALT LAKE CITY, UT 84111

GARY E. JUBBER
DOUGLAS J. PAYNE
FABIAN & CLENDENIN
215 SOUTH STATE STREET, 12th FLOOR
PO BOX 510210
SALT LAKE CITY, UT 84151

ROBERT E. RICHARDS
SONNENSCHEIN, NATH & ROSENTHAAL
7800 SEARS TOWER
CHICAGO, IL 60606

MICHAEL R. JOHNSON
SNELL & WILMER
GATEWAY TOWER WEST
15 WEST SOUTH TEMPLE, STE. 1200
SALT LAKE CITY, UT 84101

JOHN T. MORGAN
OFFICE OF THE UNITED STATES TRUSTEE
405 SOUTH MAIN STREET, STE. 300
SALT LAKE CITY, UT 84111

DUANE GILLMAN
DURHAM JONES & PINEGAR
111 EAST BROADWAY, STE. 900
SALT LAKE CITY, UT 84101